IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHELLE CHARVAT, | ) Case No. 1:20-cv-1608 |
| | ) |
| Plaintiff, | ) |
| | ) MAGISTRATE JUDGE |
| v. | ) THOMAS M. PARKER |
| | ) |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) **MEMORANDUM OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) |

Plaintiff, Michelle Charvat, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.[1] Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Charvat's application for DIB must be AFFIRMED.

**I.    Procedural History**

Charvat applied for DIB on September 12, 2017.  (Tr. 167-73).[2]  She said that she became disabled on December 20, 2015, due to: "1. Panic disorder; 2. Major depression; 3. Inability to concentrate; 4. Chiari malformation; 5. Anorexia; [and] 6. Basal vagal syncope." (Tr. 191).  The Social Security Administration denied Charvat's application initially and upon reconsideration.  (Tr. 67-103).  Charvat requested an administrative hearing.  (Tr. 113-14).

---

[1] This matter is before the court pursuant to 42 U.S.C. § 405(g), and the parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 14.
[2] The administrative transcript appears on ECF Doc. 13.

ALJ Susan Giuffre heard Charvat's case on March 5, 2019 and denied the claim in a May 3, 2019 decision. (Tr. 15-66). In doing so, the ALJ determined that Charvat had the residual functional capacity ("RFC") to perform light work, except that:

> she can never climb ladders, ropes or scaffolds; frequently climb ramps and stairs, balance, stoop, kneel and crouch; occasionally crawl; must avoid all exposure to hazards such as industrial machinery and unprotected heights; she is able to understand instructions, but the capacity to remember only simple task instructions; able to carry out simple and repetitive instructions and maintain an ordinary routine without special supervision in a setting without frequent changes, strict production quotas or fast pace; able to relate to co-workers and supervisors adequately on a superficial basis in a work environment that does not involve working with the general public and able to adapt to a setting in which duties are routine and predictable.

(Tr. 23). Based on vocational expert ("VE") testimony that an individual with her age, experience, and RFC could work in such representative occupations as non-postal mail clerk, garment sorter, and night cleaner, the ALJ determined that Charvat wasn't disabled because she could perform a significant number of jobs in the national economy. (Tr. 27). On June 3, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). And, on July 21, 2020, Charvat filed a complaint to obtain judicial review. ECF Doc. 1.

**II.** **Evidence**

    **A.** **Personal, Educational, and Vocational Evidence**

Charvat was born on December 31, 1987, and she was 27 years old on the alleged onset date. (Tr. 167). She had a college education (Bachelor of Psychology), and she'd completed a few master's level classes. (Tr. 37, 192). She had prior work experience as a bank teller, mortgage clerk, and abstracter, but the ALJ determined that she was no longer able to perform that kind of work. (Tr. 26).

B. **Objective Medical Treatment Records**

On February 10, 2015, Darryl Willet, MD, examined Charvat after she reported dizziness. (Tr. 262). Dr. Willet determined that Charvat had vasodepressor syndrome and offered a Celexa, but she wanted to try increasing her electrolyte intake instead because she'd had trouble with antidepressants in the past. (Tr. 262).

On March 10, 2015, Charvat saw Amanda Maynard, DO, for a follow-up related to a March 1, 2015 car accident. (Tr. 383). Dr. Maynard noted that Charvat still had some soreness from her accident, but she had overall improved. (Tr. 383). At her initial visit and follow-ups in 2016, Charvat reported unintentional weight loss, panic attacks, difficulty concentrating, sleep loss, migraine headaches, muscle spasms, neck pain, stress, anxiety, and agitation. (Tr. 358-59, 362-63, 383-84, 563-64). On July 1, 2015, Dr. Maynard noted that Charvat had surgery to repair her Chiari malformation; she "had recovered nicely;" she was cleared "to return to normal activities" after four weeks; and she was cleared to return to work in six weeks. (Tr. 380). On February 17, 2016, Dr. Maynard noted that Charvat was "doing well" with regard to her anxiety, she'd stopped going to physical therapy due to pain, and her neurologist was going to give her Botox injections for her headaches and neck spasms. (Tr 362). On August 24, 2016, Charvat told Dr. Maynard that her headache pain was mild, and NSAIDs, Botox and trigger injections, and antidepressants gave her moderate relief. (Tr. 563). Throughout her treatment, examinations showed that Charvat was pleasant, alert, oriented, and in no acute distress. (Tr. 359, 363, 384, 564). She had normal range of motion, normal musculoskeletal function, depressed mood/affect, cooperative behavior, normal cognition, intact cranial nerves, intact cognitive function, good insight/judgment, and logical thought process. (Tr. 359-60, 364, 384,

3

564). On August 24, 2016, examination also showed that Charvat had normal mood and affect, and her panic disorder was "stable" with therapy. (Tr. 564-65).

A few months earlier, on March 18, 2015, Charvat told Jason Schnetzler, MD, that she'd had ongoing neck and muscle spasms since her car accident, back and neck pain, and numbness in her in her occipital scalp and arms. (Tr. 405). She said she was prescribed Flexeril but denied taking any other medication for pain. (Tr. 405). Examination showed that she was well nourished, well developed, alert, oriented, and in no acute distress. (Tr. 406). She had a full range of motion in all extremities, subjective paresthesias in her hands, mild tenderness in her cervical spine and left trapezius muscle, and normal mood/affect. (Tr. 406). An MRI showed a Chiari one malformation and no evidence of spinal canal or foraminal stenosis, disc herniation, or acute trauma. (Tr. 407, 577).

On March 22, 2015, Charvat told Kelly Bitter, DO, that she had anxiety, fear, blurred vision, vomiting, and throat swelling after her ex-boyfriend punched her in the face, hit her in the rips, and held her down by her wrists. (Tr. 423-24). Examination showed that she was alert and oriented; could obey simple commands; and had appropriate behavior, normal spontaneous movement, ability to move all extremities, unrestricted range of motion, normal ambulation, and normal muscle tone/strength. (Tr. 424-25). She had pain in her shoulders, collar area, chest, ribs, and neck. (Tr. 425).

On April 2, 2015, an MRI showed hyperintense foci in the white matter of the bilateral frontal lobes, which could have represented moderate chronic microvascular ischemia and vasculopathy related to complex migraine headaches. (Tr. 576).

On June 16, 2015, Charvat went to the emergency department for intermittent chest pain and a sense of impending doom. (Tr. 442). Charvat told Brian Weeks, DO, that she'd had

increasing anxiety and panic attacks after her Chiari malformation correction surgery, and her Xanax didn't help. (Tr. 442). She said she had panic attacks when she was alone or at night, and she said she felt like she was confused and in "wonderland." (Tr. 444). On examination, Charvat was alert and oriented. (Tr. 443, 445). She had appropriate behavior, normal cardiopulmonary function, normal spontaneous movement, the ability to obey simple commands, normal ambulation, unrestricted range of motion, no muscle weakness, and normal mood/affect. (Tr. 443, 445, 448).

On February 8, 2016, Charvat saw Martin Taylor, DO, PhD, for a consultation and second opinion assessing her headaches. (Tr. 574). Dr. Taylor noted that Charvat's May 2015 Chiari malformation surgery had eliminated her feelings of shocking and tingling in her chest and body, but she still had pain, balance problems, and visual changes. (Tr. 574). Charvat also reported anxiety, depression, and sleeping difficulty. (Tr. 574). Trazodone didn't help, Zonegran caused fatigue, and Sumatriptan and hydrocodone gave her temporary relief (but caused paranoia). (Tr. 574). On examination, Charvat was well-appearing, alert, and oriented. (Tr. 574). She had increased range of motion on all planes in the spine and normal pulses. (Tr. 575). She had full visual fields, normal muscle tone and strength, normal language and cognition, normal coordination, and normal gait. (Tr. 575). On April 4, 2016, Dr. Taylor gave Charvat Botox injections for her migraines and muscle spasms. (Tr. 572). On May 12, 2016, Charvat told Dr. Taylor that the injections gave her 50% relief from headaches and pain, but she had jaw fatigue, panic attacks, and chest pain. (Tr. 570). On July 25, 2016, Charvat told Dr. Taylor that her injections relieved her head pain, but she still had spasms and tightness in her neck and shoulders, fatigue, and dizziness. (Tr. 566, 568). Dr. Taylor noted on examination that Charvat appeared well, had intact cranial nerves, and had normal mental activity. (Tr. 566).

On June 15, 2016, Charvat went to the emergency department after crashing into a telephone pole. (Tr. 512, 515). Charvat said that she had pain on the left side of her head, neck, and jaw, and she'd "lost an hour of time." (Tr. 512, 515). Examination showed that she was alert, oriented, well-developed, and well-nourished. (Tr. 519). She had tenderness in the left side of her head and midline cervical spine, but she had normal range of motion and reflexes. (Tr. 519). She had normal mood, affect, and judgment. (Tr. 519).

On July 14, 2016, Charvat saw Tejal Patel, DO, to establish care. (Tr. 616). Dr. Patel noted Charvat's history of surgery and car accidents, and Charvat told her that she'd had new onset of left leg numbness. (Tr. 616). Charvat also said that she'd stopped seeing her therapist in April and new ones hadn't worked out well. (Tr. 617). On August 17, 2016, Charvat told Dr. Patel that she had increased anxiety and dizziness, and her medication made her feel groggy or like a zombie. (Tr. 627). On October 6, 2016, Dr. Patel noted that an MRI had shown a pituitary cyst and Charvat reported feeling cold/numb in her legs, hands, and wrists. (Tr. 618). Examinations in July, August, September, and October 2016 showed that she was alert, oriented, well-developed, and well-nourished. (Tr. 617, 628, 632, 639). She had anxious mood, but normal speech, behavior, thought content, cognition, and memory. (Tr. 617, 628, 632, 639).

On February 22, March 6, and June 20, 2017, Charvat told Kari Honeycutt, NP, that she had headaches, impaired memory, muscle spasms, and moderate neck pain radiating through her shoulders and arms. (Tr. 665, 765). Charvat also reported "moderate" anxiety, difficulty concentrating, fatigue, and panic attacks, and she said that her anorexia was resolved. (Tr. 665). Examinations showed that she was alert, cooperative, oriented, well-nourished, well-developed, and in no acute distress. (Tr. 666, 767, 733). She had appropriate affect, normal speech, normal

6

senses, full range of motion in the neck, normal muscle bulk/tone, 5/5 strength in all muscles, normal coordination, and tenderness in her left arm and leg. (Tr. 668, 768, 733-34).

On March 27, 2017, Charvat told Marjorie Cecil, APRN, that she had anxiety, panic attacks, rare crying spells, self-isolation, and mild symptoms of worthlessness/hopelessness. (Tr. 678). Charvat said her sleep was bad and her moods fluctuated between feeling good/positive and irritable. (Tr. 678). On April 26, 2017, Charvat said that her trazadone made her feel too sedated, but her Lamictal helped her anxiety, she felt like her depression was "ok," and she was doing things to stay active. (Tr. 713). On examination, Charvat was well-developed, well-nourished, alert, and in no distress. (Tr. 680, 713). She had normal coordination, normal gait, cooperative and appropriate behavior, normal speech, goal directed and linear thought process, normal thought content, intact memory, and fair judgment/insight. (Tr. 681, 715).

On June 21, 2017, Charvat told Ingrid Minor, PA, that she felt well and had no complaints. (Tr. 736). Examination showed she was alert, oriented, and cooperative. (Tr. 737).

On September 26, 2017, Charvat told Shannon Wilkins, PA-C, that none of her medications for anxiety/depression had helped, she felt like she might pass out when she bent over, she had arthritis, and she had severe osteoporosis. (Tr. 742-43). Examination in September and October 2017 showed full orientation, well-developed and well-nourished constitution, normal mood and affect, normal behavior, normal reflexes, and alertness. (Tr. 743, 748).

On December 12, 2017, Charvat saw Mindy Schuller, CNP, for pain management. (Tr. 771). Charvat said that she'd had chronic pain and osteoporosis with bone fractures since she was 13. (Tr. 772). On examination, Charvat was oriented, well-developed, well-nourished,

7

alert, and in no distress.  (Tr. 772-73).  She had normal range of motion in all areas, and her gait was normal.  (Tr. 772-73).

On March 5, 2018, Charvat saw Joseph Hannah, MD, for her headaches.  (Tr. 841).  Charvat rated her pain as 4 on a 10-point scale.  (Tr. 844).  Examination showed that she was alert and oriented.  (Tr. 844).  She had 5/5 motor function, normal gait, and normal coordination.  (Tr. 844).

On April 18, 2018, Charvat told Lahndan Onger, MD, that she had frequent migraines and level 3/10 pain in her shoulders, neck, and bilateral hips.  (Tr. 866).  She denied depression.  (Tr. 866).  Examination showed full orientation and a well-developed and well-nourished constitution.  (Tr. 868).  She also had normal motor function, mood, memory, affect, and judgment.  (Tr. 869).

On May 17, 2018, Charvat told Kornelia Solymos, MD, that Lyrica didn't help her pain and she had difficulty sleeping.  (Tr. 946-47).  On June 28, 2018, Charvat reported feeling dizzy, confused, and anxious.  (Tr. 975).  On August 2, 2018, Charvat said that her legs occasionally tingle, yoga and stretching bothered her, and she'd fallen off her bicycle.  (Tr. 997).  On October 17, 2018, Charvat said that she felt like a "switch was flipped," and she was doing better with her pain and therapy.  (Tr. 1030).  She said that she was able to "do[] more squats."  (Tr. 1030).  Examinations showed that she was well-developed and well nourished.  (Tr. 949, 978, 1033).  She had normal range of motion, mood, memory, affect, and judgment.  (Tr. 949, 978, 1033).

On June 8, 2018, Katherine DiSano, MD, noted that Charvat was well-developed, alert, and in no distress.  (Tr. 957)  She had appropriate mood and affect.  (Tr. 957).  And she was able to follow all commends with no gross deficits.  (Tr. 957).

8

On June 27, 2018, Brendan Astley, MD, gave Charvat Botox injections for her migraines. (Tr. 969). Dr. Astley noted that Charvat was alert, in no distress, and cooperative. (Tr. 969). On September 17, 2018, Charvat said that her pain was not controlled, and her medication was switched from Lyrica to Topamax. (Tr. 1015-17). On September 19, 2018, Dr. Astley noted that Charvat's headaches were "well controlled" on Topamax. (Tr. 1023).

### C. Physical Therapy Records

From April 18 through May 2018, Charvat saw Jennifer Benedetti, PT, for physical therapy. (Tr. 880-84, 889-91, 911-13, 918-20, 938-41). At her initial visit, Charvat said that her pain ranged from 0/10 in the morning to an average of 5/10. (Tr. 882). On April 25 and 28, 2018, Charvat reported a decrease in symptoms and improving strength. (Tr. 891, 913). On May 2, 2018, Benedetti noted that Charvat had displayed good understanding and technique when performing exercises. (Tr. 920). On May 30, 2018, Benedetti noted that Charvat had improved her symptoms , but her anxiety was giving her a "fight or flight" response when active and contributed to muscle tension. (Tr. 940). Her physical therapy was discontinued, and Benedetti told her to continue with an independent home exercise program. (Tr. 940).

### D. Mental Health Therapy Records

From July 29 through November 17, 2016, Charvat saw Diane Latimer, PsyD, for mental health counseling. (Tr. 581-612). At her initial evaluation, Dr. Latimer diagnosed Charvat with PTSD, major depression, generalized anxiety, and ADHD. (Tr. 611-12). Although Dr. Latimer helped Charvat process her feelings and memories, she consistently noted that there was no change in Charvat's depression, anxiety, fear, and anger. (Tr. 581-610).

On March 29, 2017, Charvat told Donna Mahan, LPCC, that she had difficulty making decisions for fear of making the wrong one, had four panic attacks every day, no longer felt able

9

to drive, was afraid to go outside by herself, and had palpitations, tunnel visions, and feelings of doom when she went grocery shopping with her sister. (Tr. 703). Examination showed anxious mood and affect, and she had normal thought processes. (Tr. 704). On May 2, 2017, Charvat told Mahan that she felt overwhelmed and that she couldn't be responsible or "do this adult stuff." (Tr. 725). Examination showed cooperative attitude, normal speech, goal directed thought processes, normal thought content, and anxious mood/affect. (Tr. 726).

On January 12, 2018, Charvat told Sean Delmore, LISW, that she had panic, depression, diminished interest, sleep difficulties, fatigue, lack of concentration, and feelings of worthlessness. (Tr. 797). She said she had difficulty with memory and sustaining attention. (Tr. 799). Examination showed full orientation, sustained concentration, cooperative and calm behavior, congruent affect, normal speech, logical and organized thought process, congruent thought content, and normal cognition. (Tr. 801-02).

On May 3, 2018, Sarah Benuska, PhD, noted an "[o]verall decrease in anxiety and improve[d] well-being." (Tr. 931). Charvat reported exercise, walking, and calling her mom/sister as coping techniques. (Tr. 931). Examination showed cooperative and anxious behavior, full orientation, normal speech, logical and organized thought process, tight association, no abnormal thoughts, good judgment and insight, normal recent and remote memory, distractable attention and concentration, and full affect. (Tr. 932). On July 3, 2018, Benuska noted that Charvat had sustained attention and concentration. (Tr. 986).

  E.  **Opinion Evidence**

    1.  **Treating Therapist – Diane Latimer, PsyD**

In a questionnaire, Dr. Latimer stated that Charvat had poor concentration, was easily overwhelmed, and was easily confused. (Tr. 578). Dr. Latimer stated that Charvat was easily

10

fatigued to the point that she could not perform normal daily activities, and she lacked motivation for work, socializing, and taking care of herself. (Tr. 578). Dr. Latimer stated that "her current situation is unknown." (Tr. 579).

### 2. Social Worker – Mark Kaplafka, PCC-S

On December 8, 2017, Mark Kaplafka, PCC-S, opined that Charvat's depression and anxiety caused her to have a high need for rest, low stress tolerance, and difficulty in social situations. (Tr. 763). She struggled with food preparation, completing household chores, shopping, and driving due to her anxiety and low motivation. (Tr. 764). She bathed twice a week, wore the same clothes for several days in a row, and paid bills late. (Tr. 764). But she was compliant with weekly appointments. (Tr. 764).

### 3. State Agency Consultants

In December 2017 and April 2018, Lynne Torello, MD and Yeshwanth Bekal, MD, respectively, and David Dietz, PhD, and Aracelis Rivera, PsyD, respectively, reviewed the record evidence and opined that Charvat could perform a reduced range of light work. (Tr. 78-82, 96-100. The state agency consultants opined that Charvat could never climb ladders, ropes, or scaffolds; could only frequently climb ramps and stairs, balance, stoop, kneel, and crouch; and could occasionally crawl. (Tr. 78-82, 96-100). She needed to avoid exposure to all hazards such as industrial machinery and unprotected heights. (Tr. 78-82, 96-100). She could understand, remember, and carry out simple and repetitive instructions; maintain an ordinary routine without special supervision in a setting without frequent changes, strict production quotas, or fast pace; relate to coworkers and supervisors adequately on a superficial basis in a work environment that did not involve working with the general public; and adapt to a setting in which duties are routine and predictable. (Tr. 78-82, 96-100).

### F. Relevant Testimony

At the ALJ hearing, Charvat testified that she had difficulty working due to migraine headaches and pain in her head, neck, back, hips, and joints. (Tr. 46, 49). Charvat said that she needed to take walking breaks every hour when she worked, and she would miss work a couple times a week. (Tr. 49). She had problems standing for more than a few minutes. (Tr. 56). She had a migraine about four days per week in the afternoon, during which she had to lie down in a dark room until she recovered. (Tr. 47-50). Charvat also had depression and anxiety, and she'd have panic attacks when driving to work. (Tr. 42-43, 49). It took her an hour to calm down after panic attacks. (Tr. 42-43). Her pain and anxiety medication made her feel fatigued and unmotivated, and she had difficulty concentrating and completing work "at a high level." (Tr. 44, 49, 53). She used a TENS unit, heating pad, and medication for her pain. (Tr. 47). She tried physical therapy, acupuncture, chiropractic therapy, massage therapy, and pain management. (Tr. 52). And she complied with all her treatments. (Tr. 53).

Charvat also testified that she lived by herself and was mostly able to take care of herself (including laundry). (Tr. 40, 47). She said that her sister came over once a week and took her to the grocery store because she had anxiety about shopping alone, although she sometimes went alone. (Tr. 40). She sometimes drove around town, but rarely drove on the freeway because it made her panic. (Tr. 41). She went to the gym across the street from her apartment a couple times a week to do strength-building exercises, so that her osteoporosis wouldn't get worse. (Tr. 44). But exercising made her pain worse. (Tr. 46).

James Primm, a vocational expert ("VE") testified that someone with Charvat's RFC (as posited by the ALJ) could work in such representative occupations as a non-postal mail clerk, garment sorter, or night cleaner. (Tr. 61). On further questioning by Charvat's counsel, the VE

12

said that an individual whose pain or panic attacks caused lapses of concentration exceeding 20 percent of the workday would be unable to work. (Tr. 62-63). And unscheduled absences greater than one day per month would preclude competitive employment. (Tr. 63).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B. Step Four: Subjective Symptom Complaints

Charvat argues that the ALJ failed to adequately analyze the factors set out in SSR 16-3p when evaluating her subjective symptom complaints. ECF Doc. 15 at 15-17. She also asserts that substantial evidence didn't support the ALJ's finding that her subjective complaints were inconsistent with evidence that she was regularly described as "well" and had only received routine/conservative treatment. ECF Doc. 15 at 12-15. Charvat contends that the same records describing her as "well" also demonstrated that she had chronic tension headaches, anxiety, and neck pain. ECF Doc. 15 at 13-14. And her Botox injections, medicine, acupuncture, physical therapy, and surgery weren't routine/conservative treatment. ECF Doc. 15 at 14-15. Charvat also asserts that the record the ALJ cited for the proposition that she had recovered "nicely" from surgery didn't actually discuss her surgery recovery at all, but instead addressed an emergency room visit following an assault. ECF Doc. 15 at 13. Moreover, she argues that the ALJ's failure to adequately discuss contrary evidence or explain how she considered her daily activities and pain left the ALJ's conclusion that she could work 8 hours per day for 5 days per week unsupported. ECF Doc. 15 at 15, 17. The Commissioner disagrees. ECF Doc. 16 at 8-14.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four. *See* 20 C.F.R. § 404.1520(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other

14

evidence in the record. SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints). In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate her symptoms, the whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4, at *15-19; 20 C.F.R. § 404.1529(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

      The ALJ applied proper legal standards in evaluating Charvat's subjective symptom complaints. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Here, the ALJ complied with the articulation requirement in SSR 16-3p by explaining that she found Charvat's subjective complaints inconsistent with the record as a whole. (Tr. 23-25); SSR 16-3p, 2016 SSR LEXIS 4, at *15; *Felisky*, 35 F.3d at 1036. Further, the ALJ didn't improperly rely on only the objective medical evidence in evaluating Charvat's subjective symptom complaints, but evaluated her complaints based on all the evidence in the longitudinal record. SSR 16-3p, 2016 SSR LEXIS 4,

at *10-11 (indicating that the ALJ should not rely "solely on objective medical evidence" in evaluating subjective complaints). Reading the ALJ's decision as a whole, the ALJ considered Charvat's complaints of migraines, body aches, and panic attacks in light of: (1) her testimony that she typically doesn't leave the house alone and has to grocery shop with a friend, feels fatigued after taking medication, and has difficulty sleeping due to pain, (Tr. 23); (2) objective medical and opinion evidence reflecting her functional abilities, (Tr. 24-25); and (3) the different kinds of treatment she used, their effectiveness, and their side effects, (Tr. 23-24). And, although the ALJ wasn't required to specifically discuss each of the regulatory factors in her decision, she specifically acknowledged that she considered Charvat's subjective complaints "based on the requirements of 20 CFR 404.1529 and SSR 16-3p." (Tr. 23); *Renstrom*, 680 F.3d at 1067; *Simons*, 114 F. App'x at 733.

Substantial evidence also supported the ALJ's finding that Charvat's subjective complaints were inconsistent with other evidence in the record. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Such evidence includes: (1) treatment notes regularly indicating that Charvat was "doing well," oriented, alert, well-nourished, and well-developed notwithstanding her conditions, (Tr. 359, 362-63, 384, 406, 424-25, 443, 445, 519, 564, 566, 574, 617, 628, 632, 639, 666, 680, 713, 767, 733, 736-37, 743, 748, 772-73, 844, 949, 957, 969, 978, 1033); (2) treatment notes indicating that Charvat had normal range of motion, normal musculoskeletal function, cooperative behavior, normal cognition, intact cognitive function, good or fair judgment/insight, logical thought process, normal memory, and normal mood/affect, (Tr. 359-60, 364, 384, 406, 424-25, 443, 445, 448, 519, 564, 575, 617, 628, 632, 639, 666, 681, 704, 715, 726, 733-34, 743, 748, 767, 772-73, 801-02, 844, 932, 949, 957, 969, 978, 986, 1033); (3) Charvat's own reporting that her pain was mild to moderate, and that her medications and Botox injections helped relieve

16

her pain, migraines, and anxiety, (Tr. 563, 570, 572, 1023, 1030); (4) notes indicating that Charvat's mental health conditions were "stable" with therapy and medication, (Tr. 564-65); and (5) the state agency consultants' opinions that Charvat could perform a reduced range of light work consistent with the ALJ's ultimate RFC finding, (Tr. 78-82, 96-100). *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476. Here, Charvat's argument – that substantial evidence didn't support the ALJ finding that she had "recovered 'nicely' from the surgery and within four weeks was cleared to return to normal activities (Exhibit 4F/23)" – is unavailing. *See* ECF Doc. 15 at 13. While Charvat is correct that Exhibit 4F/23 doesn't say anything about her recovery from surgery, this appears to only be a typographical error in the ALJ's citation to Exhibit 3F/23. *Compare* (Tr. 425) (Exhibit 4F/23, emergency department notes), *with* (Tr. 380) (Exhibit 3F/23, noting that Charvat "had recovered nicely" from her Chiari malformation surgery and was cleared to return to normal activities within four weeks). And, even if a preponderance of other evidence in the record could have supported a different finding, this court is not permitted to second-guess the ALJ's reasoning when substantial evidence supported it. *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

Accordingly, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the ALJ's finding that Charvat's subjective complaints weren't consistent with other evidence in the record must be AFFIRMED.

    **C.**     **Step Four: Omission of Absenteeism from RFC**

Next, Charvat argues that the ALJ erred in failing to include in her RFC finding that Charvat would be absent from work at least 2-3 times per week due to her migraines. ECF Doc. 15 at 18-19. Charvat asserts that the failure to include such a limitation in her RFC violated SSR 96-8p, which requires an ALJ to assess an individual's ability to perform sustained work (8 hours

17

per day, 5 days per week or equivalent). ECF Doc. 15 at 18. The Commissioner's brief doesn't address this issue. *See generally* ECF Doc. 16.[3]

The ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC represents the *most* that a claimant can do on a "regularly and continuing basis," despite her impairments. SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) ("Regular and continuing basis" means 8 hours a day, 5 days a week or equivalent.); *see also Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.

The ALJ applied proper legal standards in assessing Charvat's RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. In determining what limitations to include in the RFC, the ALJ complied with the regulations by "consider[ing] all symptoms" and assessing "the intensity, persistence, and limiting effects" of those symptoms in light of Charvat's testimony, objective medical evidence, and opinion evidence. (Tr. 23-25); 20 C.F.R. § 404.1520(e). The ALJ specifically: (1) addressed Charvat's testimony and other evidence concerning fatigue, panic attacks, migraines, and pain, (Tr. 23-25); and (2) explained that the evidence in the record (including treatment notes reporting normal psychological findings, normal concentration, and cooperative behavior) demonstrated that she could understand and carry out simple/repetitive instructions and maintain an ordinary routine in a setting without frequent changes, (Tr. 25). And that's all the regulations required. SSR 96-8p, 1996 SSR LEXIS 5.

---

[3] Although Charvat didn't include this issue in a separate argument section, her argument made specific references to relevant facts and law. ECF Doc. 15 at 18-19. Thus, it is not forfeited as perfunctory. *But see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (Perfunctorily raised arguments are forfeited.); *see also* ECF Doc. 16 at 8 n.2 (raising a generalized forfeiture argument).

Substantial evidence also supported the ALJ's decision not to incorporate greater limitations (such as 2-3 days' absenteeism per week). 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Such evidence includes treatment notes that Charvat: (1) was "doing well," well-nourished, and well-developed; (2) had cooperative behavior, normal cognition, intact cognitive function, logical thought process, normal memory, normal mood/affect, the ability to follow commands, and good or fair judgment/insight; and (3) notes that medication, therapy, and other treatments helped her condition stabilize. (Tr. 359-60, 362-64, 384, 406, 424-25, 443, 445, 448, 519, 564-66, 570, 572, 574-75, 617, 628, 632, 639, 666, 680-81, 704, 713, 715, 726, 733-34, 743, 748, 767, 772-73, 801-02, 844, 932, 949, 957, 969, 978, 1023, 1033); *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476. And the ALJ's ultimate RFC was consistent with the state agency consultants' medical opinions. (Tr. 78-82, 96-100). Thus, because the ALJ's ultimate RFC finding was reasonably drawn from the evidence in the record, it fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

Accordingly, the ALJ's ultimate RFC finding must be AFFIRMED.

IV.    **Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Charvat's application for DIB must be, and hereby is, AFFIRMED.

**IT IS SO ORDERED.**

Dated: August 17, 2021

Thomas M. Parker
United States Magistrate Judge